IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | : | CHAPTER SEVEN |
| SCOTT W. DART & LISA R. DART | : | BANKRUPTCY NO.: 5-04-bk-50694 |
| DEBTORS | : | |
| MARIANN R. KOSTELABA & MICHAEL C. KOSTELABA, | : | {**Nature of Proceeding**: Complaint Objecting to Dischargeability of Debt} |
| PLAINTIFFS | : | |
| vs. | : | |
| SCOTT W. DART & LISA R. DART, | : | |
| DEFENDANTS | : | **ADVERSARY NO.: 5-04-ap-50161** |

# OPINION[1]

Currently before the Court is Plaintiffs' objection to the discharge of their debt pursuant to 11 U.S.C. § 523(a)(2)(A). Resolution pivots on Plaintiffs' allegations they were defrauded into purchasing a home located at 339 Old East End Boulevard, Bear Creek, Pennsylvania.

**I. Facts**

The Kostelabas first went to view the home on February 9, 2003. The Darts and their two children were not home during the first inspection. At that inspection, the Kostelabas were given a disclosure statement which the Darts had completed on August 29, 2002. (Plaintiffs' Exhibit 3.) The disclosure statement was a worksheet containing a section with check boxes for the type of water system the house used, the holding tank box was checked and the cesspool box

---

[1] Drafted with the assistance of Kathryn F. Evans, Law Clerk.

[m:\users\cathy\opinions\5-04-ap-50161_Dart.wpd]

Case 5:04-ap-50161-JJT   Doc 28   Filed 12/29/06   Entered 12/29/06 15:07:47   Desc
Main Document   Page 1 of 11

had an asterisk next to it.[2] (Plaintiffs' Exhibit 3.) The disclosure statement stated the last date the tank had been serviced was August 30, 2002.[3]

On February 14, 2003, the Kostelabas made two offers on the home, their second offer was accepted. On February 19, 2003, the Kostelabas, their realtor, their inspector, the Darts' realtor, and the Darts attended the home inspection. As discussed at length below, during the inspection, the Kostelabas' realtor asked Mr. Dart how many times the holding tank had to be cleaned. While recollections differed, all witnesses confirmed that Mr. Dart replied the tank had to be cleaned no more often than five times a year.[4] The sale closed on March 28, 2003.

Before the Kostelabas moved into the home, they began painting certain rooms during which time they used the bathroom. In May of 2003, prior to moving in, they noted the alarm light on the holding tank was on, signaling it needed to be pumped out. This was a surprise to the Kostelabas, considering nobody was living in the home, and the Darts had previously told them they were going to empty the tank before the closing. The Kostelabas contacted their realtor, who contacted the Darts' realtor who, in turn, contacted the Darts. Mrs. Dart left a message on the Kostelabas' answering machine listing dates on which the holding tank had been cleaned.[5] When the Kostelabas realized how quickly the tank was filling up with such little use, they wrote a demand letter to the Darts, seeking rescission of the sales contract.[6]

---

[2] The reason for the asterisk was because the Darts had a 2,500 gallon holding tank installed in early 2000 as a result of a sewage leakage problem and by virtue of the fact the premises was not suitable for an on lot sewage disposal system.

[3] The Darts' postdated the document by one day in anticipation of a scheduled cleaning.

[4] Mr. Kostelaba remembers that he was told every 6 months (Audio Record of 10/18/05 at 11:54 a.m.); Mr. Dart recalls 4-5 times a year (Audio Record of 10/18/05 at 3:39 p.m.); Dart's realtor 4-5 times a year (Audio Record of 10/18/05 at 3:42 p.m.); Mrs. Kostelaba twice a year (Joint Exhibit 3 [Deposition of Mariann R. Kostelaba] at 13, lines 4-11.)

[5] February 17, 200; June 6, 2002; September 6, 2002; and January 10, 2003.

[6] Plaintiffs' Exhibit 6 dated June 10, 2003.

Because of the home's water issues, the Kostelabas extended their apartment lease until December of 2003. Before moving into the home, and because of the expense of frequently pumping the system[7], they purchased a $1,700 incinerator toilet[8], started doing their laundry at a laundromat, joined a gym specifically to use the shower facilities, and took other extreme remedies to conserve water. However, even with these measures, they still needed to pump the tank at least once or twice a month.

In early 2004, they filed a lawsuit in state court against the Darts seeking, among other things, rescission of the sales contract. Shortly thereafter, the Darts filed for Chapter Seven bankruptcy. The Kostelabas then filed the instant adversary objecting to the dischargeability of their debt on grounds it is non-dischargeable under 11 U.S.C. § 523(a)(2)(A).

**II. Non-Dischargeability & 11 U.S.C. § 523(a)(2)(A)**

Section 523(a)(2)(A) lists certain exceptions to discharge including one "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by- (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). The Supreme Court has interpreted the "fraud" required by this Section to be synonymous with the fraud defined in the general common law of torts; more specifically, fraud as defined in the Restatement (Second) of Torts. *Field v. Mans,* 516 U.S. 59, 70, 116 S.Ct. 437, 443-44 (1995). The Restatement (Second) of Torts defines "fraudulent misrepresentation" as follows:

> One who fraudulently makes a representation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation.

---

[7] To have 1,000 gallons pumped from the tank it would cost between $160-185. To have the entire 2,500 gallon tank emptied would cost between $400 and $462. (Audio Record [Mr. Kostelaba] of 10/18/05 at 1:56 p.m.)

[8] This toilet broke after a few months from overuse.

*Restatement 2d Torts* § 525 (1977).

### a) Misrepresentation and Intent

Breaking the tort of misrepresentation into its essential elements, the first element is a misrepresentation of fact. *Id.* Here, the fact at issue is the frequency of pumping the holding tank. All parties agree that during the closing inspection Mr. Dart, Mr. Kostelaba, and Mr. Kostelaba's realtor, Robert Kopec, were in the kitchen and Mr. Kopec asked Mr. Dart how often the holding tank needed to be cleaned. As indicated earlier, Mr. Dart's response was it needed to be cleaned no more than 5 times a year.

Frank Yegenski, a certified sewage enforcement officer, testified that a family of four uses an average of 250 gallons of water a day. At the time the house was sold, the Dart family consisted of two adults, a pre-teen son, and an infant son. (Audio Record of 10/18/05 at 3:01 p.m.) Assuming that the Darts used their water system in an average manner, their 2,500 gallon holding tank would fill completely every ten days. Mr. Dart testified that although they made some efforts to conserve water, they "didn't do anything out of the ordinary." (Audio Record [Mr. Dart] of 10/18/05 at 3:07-08 p.m.) He testified he and his wife took showers everyday, washed dishes everyday, and used the bathroom everyday. (Audio Record [Mr. Dart] of 10/18/05 at 3:07-08 p.m.) However, he then qualified this answer and discussed some minor measures he and his family took to conserve water, such as not leaving the faucet running while washing their dishes. (Audio Record [Mr. Dart] of 10/18/05 at 3:07-08 p.m.) Their washing machine was not attached to the holding tank but, rather, the used laundry water drained into the basement and was then pumped outside by a sump pump. Because the Darts made efforts to conserve water, the Court will assume their family of four used half of the water that an average family of four would normally use (125 gallons of water a day). However, even at half the average, the tank would still require emptying once every twenty days (eighteen times a year).

This is far above the 2-5[9] times a year Mr. Dart told the Kostelabas.

The second element of misrepresentation is intent. In the context of a discharge exception, the requisite intent to deceive may be inferred from the totality of the circumstances of a case. *In re Bruce*, 262 B.R. 632, 637 (Bankr.W.D.Pa. 2001) citing *In re Rembert*, 141 F.3d 277, 282 (6th Cir.) *cert denied,* 525 U.S. 978, 119 S.Ct. 438, 142 L.Ed.2d 357 (1998). In the case before me, there is ample evidence that the frequency of draining the holding tank was a pivotal issue in concluding the sale with the Plaintiffs, and they were deliberately misled by Mr. Dart.

### b) Reliance

The third requisite element in establishing fraudulent misrepresentation is both actual and justifiable reliance. *Field*, 516 U.S. at 70.

#### i) Justifiable Reliance

The Eleventh Circuit, in the context of examining the Restatement (Second) of Torts, summarized the standard of justifiable reliance as follows:

> To constitute justifiable reliance, the plaintiff's conduct must not be so utterly unreasonable, in light of the information apparent to him, that the law may properly say that his loss is his own responsibility. . . Justifiable reliance is gauged by an individual standard of plaintiff's own capacity and the knowledge which he has, or which may fairly be charged against him from the facts within his observation in light of his individual case. Additionally, it is only where, under the circumstances, the facts should be apparent to one of the plaintiff's knowledge and intelligence from a cursory glance, or he has discovered something which should serve as warning that he is being deceived, that he is required to make an investigation of his own.

*In re Vann*, 67 F.3d 277, 283 (11th Cir. 1995) citing Prosser & Keeton on Torts at 751, and Restatement (Second) of Torts § 545A cmt. b. (1977) (internal citation marks omitted).

The Darts argue the Kostelabas have failed to establish justifiable reliance in that the Darts did not attempt to hide the existence of the holding tank, and the Kostelabas were given the

---

[9] If the tank was emptied five times a year that would require 72 days between emptying. This would suggest a daily average usage of 34.7 gallons a day or 14% of average family use.

opportunity to inspect the tank prior to purchasing the house. The Court disagrees.

The Kostelabas' conduct with regard to the holding tank was more than reasonable in light of the information apparent to them at the time of the closing. The Darts' argument that the Kostelabas' awareness of the holding tank in and of itself is sufficient to negate justifiable reliance is misplaced, in that the existence of the tank is not at issue here, but rather it's the time for the tank to fill to capacity. The time it takes for the tank to fill is not something easily discovered by a cursory glance. The best way to determine how long it takes to fill the holding tank is to ask the occupants of the home. It is undisputed that the Kostelabas' realtor asked Mr. Dart how long it took to fill the holding tank. The response vastly underestimated the actual number of service calls to empty the holding tank.

While the Plaintiff, Michael Kostelaba, is an educated individual, neither he nor his spouse had any background in sewage use or treatment. I find the following quote from the United States Supreme Court case of *Field v. Mans* 516 U.S. 59, 116 S.Ct. 437, (U.S.,1995) to be particularly applicable.

> Since the District Court treated Mans's conduct as amounting to fraud, we will look to the concept of "actual fraud" as it was understood in 1978 when that language was added to § 523(a)(2)(A). Then, as now, the most widely accepted distillation of the common law of torts was the Restatement (Second) of Torts (1976), published shortly before Congress passed the Act. The section on point dealing with fraudulent misrepresentation states that both actual and "justifiable" reliance are required. Id., § 537. The Restatement expounds upon justifiable reliance by explaining that a person is justified in relying on a representation of fact "although he might have ascertained the falsity of the representation had he made an investigation." Id., § 540. Significantly for our purposes, the illustration is given of a seller of land who says it is free of encumbrances; according to the Restatement, a buyer's reliance on this factual representation is justifiable, even if he could have "walk[ed] across the street to the office of the register of deeds in the courthouse" and easily have learned of an unsatisfied mortgage. Id., § 540, Illustration 1. The point is otherwise made in a later section noting that contributory negligence is no bar to recovery because fraudulent misrepresentation is an intentional tort. Here a contrast between a justifiable and reasonable reliance is clear: "Although the plaintiff's reliance on the misrepresentation must be justifiable this does not mean that his conduct must

conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." Id., § 545A, Comment b. Justifiability is not without some limits, however. As a comment to § 541 explains, a person is

> "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation. Thus, if one induces another to buy a horse by representing it to be sound, the purchaser cannot recover even though the horse has but one eye, if the horse is shown to the purchaser before he buys it and the slightest inspection would have disclosed the defect. On the other hand, the rule stated in this Section applies only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by the use of his senses. Thus a defect that any experienced horseman would at once recognize at first glance may not be patent to a person who has had no experience with horses." Id., § 541, Comment a.

A missing eye in a "sound" horse is one thing; long teeth in a "young" one, perhaps, another.

> Similarly, the edition of Prosser's Law of Torts available in 1978 (as well as its current successor) states that justifiable reliance is the standard applicable to a victim's conduct in cases of alleged misrepresentation and that "[i]t is only where, under the circumstances, the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own." W. Prosser, Law of Torts § 108, p. 718 (4th ed.1971); (footnotes omitted); accord, W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts § 108, p. 752 (5th ed. 1984) (Prosser & Keeton).

*Field v. Mans* 516 U.S. 59, 70-72, 116 S.Ct. 437, 443-444 (U.S.,1995)

The existence of the holding tank was a fact known to the Kostelabas. Nevertheless, the frequency of service would require either reliance on the then-owners or some significant investigation. While a reasonable man may not have relied on an owner's statement in this regard, "justifiable" reliance requires conformity to a reduced standard. The Kostelabas justifiably relied on the statements of Mr. Dart that the holding tank required no more than five

cleanouts a year with conservative usage.

### ii) Actual Reliance

The record indicates that the Kostelabas actually relied on Mr. Dart's representations. Mr. Kostelaba testified that he told Mr. Dart during the pre-closing inspection that he would absolutely not be interested in the house if it had to be cleaned more often than Mr. Dart represented. (Audio Record [Mr. Kostelaba] of 10/18/05 at 11:56 a.m.) Mr. Kostelaba also testified that during the pre-closing inspection he told the Darts' realtor he wanted to get a jacuzzi bath tub. (Audio Record [Mr. Kostelaba] of 10/18/05 at 11:54 a.m.) In sum, the Court finds that Mr. Kostelaba made it clear to the Darts during the pre-closing inspection that the water system was an integral factor in the Kostelabas' decision to purchase the house and that the Kostelabas actually relied on Mr. Dart's representations.

## III. Fraud & the Parol Evidence Rule

The Defendants contend the parol evidence rule precludes the Kostelabas from introducing into evidence any of Mr. Dart's statements. The parol evidence rule "forbids the introduction of parol evidence of antecedent or contemporaneous agreements, negotiations and understandings of the contracting parties for the purpose of varying or contradicting the terms of a contract which both parties intended to represent the definite and complete statement of their agreement." *American Bank and Trust Co. Of Pennsylvania v. Lied*, 487 Pa. 333, 340, 409 A.2d 377, 381 (1979), *see also Corbin on Contracts,* § 573. However, the applicability of the parol evidence rule is compromised when the evidence seeking to be excluded regards fraudulent conduct. See 37 Am. Jur. 2d Fraud and Deceit § 480 ("the parol evidence rule . . . is inapplicable where the issue is whether the contract was procured by fraud because the parol evidence rule can not be used as a shield to prevent the proof of fraud."). In Pennsylvania, the seminal case on the fraud exception to the parol evidence rule remains *LeDonne v. Kessler,* 256 Pa. Super. 280,

389 A.2d 1123, 1130 (1978). See *Rock v. Voshell*, 397 F.Supp.2d 616, 624 (E.D. Pa. 2005). In *LeDonne,* the court qualified the fraud exception to parol evidence rule by creating a balancing test to determine whether the exception applies. 256 Pa. Super. at 1130. The test requires the court to:

> balance the extent of the party's knowledge of the objectionable conditions derived from a reasonable inspection against the extent of the coverage of the contract's integration clause in order to determine whether that party could justifiably rely upon oral representations without insisting upon further contractual protection or the deletion of an overly broad integration clause.

*Id.*

### a) The Kostelabas' Knowledge of the Objectionable Conditions

Again, the objectionable condition at issue in this case is the time it takes to fill the holding tank to capacity. As discussed at length above, the Kostelabas conducted a reasonable inspection under the circumstances, and because of the unique nature of the problem[10], the Court found their knowledge of the problem to be minimal at best.

### b) Coverage of the Contract's Integration Clause

The integration clause is long and detailed, therefore only the pertinent parts are reiterated below:

> Buyer understands that any representations.... made by Seller, Brokers . . .are not part of this Agreement unless expressly incorporated or stated in this Agreement . . . It is understood that Buyer has inspected the Property before signing this Agreement . . .and has agreed to purchase the property in its present condition...

Plaintiff's Exhibit 4, ¶ 26.

### c) Balancing Test

In determining how to balance the two aforementioned considerations, the Court finds instructive the *LeDonne* case and its factual circumstances. *LeDonne* involved a contract to sell

---

[10] The unique nature of the problem being that it is difficult to determine how long it takes to fill to capacity a 2,500 water tank during a one day inspection, coupled with the fact the best way to determine how long it takes is to ask the current owner of the premises.

a home where, during an inspection of the premises prior to the sale, the buyers noticed indicia of leakage in the basement and the sundeck and questioned the buyers about it. *LeDonne,* 389 A.3d at 1125-26. The buyers told them the areas were free of water and septic problems. *Id.* The court ultimately concluded since Mr. LeDonne, Mrs. LeDonne, and her father, who was a carpenter, *actually* detected ample evidence of a problem, discussed it with the sellers, and then signed the contract containing the integration clause, the clause trumped the fraud exception to the parol evidence rule. *Id.*

The instant case is distinguishable from *LeDonne.* This Court finds germane the difference between readily visible evidence of water damage and the recondite defect of the frequency of emptying the holding tank. Water damage is easily ascertained even by a lay person, whereas the time required to fill a holding tank is not common knowledge. There was obvious and concrete evidence to alert the *LeDonne* plaintiffs to the existence of a problem and the need to do independent research. Conversely, with the Kostelabas, even their inspector thought it sufficient to rely on the Darts' representations to determine how long it took to fill the holding tank with normal family use. Thus, in recognition of the latent nature of the defect at issue and the serious misrepresentations made by Mr. Dart, the Court finds the fraud exception to the parol evidence rule trumps the integration clause in the parties contract.

## IV. Conclusion

The Kostelabas have met all the requisite elements of the tort of fraudulent misrepresentation against Scott W. Dart. The record lacks any evidence that Lisa R. Dart, the

co-debtor, cooperated in this fraudulent misrepresentation. Therefore, the objection to the dischargeability of Kostelaba debt under 11 U.S.C. § 523(a)(2)(A) is sustained as to Scott W. Dart and overruled as to Lisa R. Dart.

An Order will follow.

Date:   December 29, 2006

John J. Thomas, Bankruptcy Judge

(CMS)

*This opinion is electronically signed and filed on the same date.*